**The PEOPLE of the State of Colorado, Complainant,**

v.

**Edward M. YAKLICH, Attorney-Respondent.**

**No. 86SA360.**

Supreme Court of Colorado, En Banc.

Oct. 13, 1987.

Linda Donnelly, Disciplinary Prosecutor, Denver, for complainant.

McDermott, Hansen, Anderson & Reilly, Daniel M. Reilly, Denver, for attorney-respondent.

ROVIRA, Justice.

A formal complaint was filed with the Colorado Supreme Court Grievance Committee alleging that respondent, Edward M.

Yaklich, had accepted a case for the complaining witness, received a retainer, then failed to appear at hearings or otherwise properly represent his client. A hearing board of the Grievance Committee found that misconduct had occurred and recommended that respondent be suspended from the practice of law for two years, be ordered to make restitution to his client, and be assessed the costs of the disciplinary proceedings. A hearing panel of the Grievance Committee concurred.

The respondent has filed exceptions to the report of the Grievance Committee, contending that the hearing board's findings of fact are unsupported by the evidence, that no misconduct occurred or, in the alternative, that the recommended discipline is too harsh. We agree with the Grievance Committee that misconduct occurred and also agree with its recommended discipline. Accordingly, respondent is suspended from the practice of law for two years and ordered to pay restitution to his client and the costs of these proceedings.

I.

The respondent was admitted to the bar of the Supreme Court of Colorado in 1949, and admits the jurisdiction of this court and our Grievance Committee. He is a sole practitioner with a general practice in Pueblo, Colorado.

On December 9, 1982, respondent met for the first time with Elaine Sapeda, the complaining witness. Sapeda was eighteen years of age at the time. At sixteen, she had dropped out of high school halfway through her junior year to marry Antonio Garcia. They had a daughter, Crystal, ten months later. Garcia suffered emotional problems which led to his hospitalization five times during the marriage, and, combined with his inclination to physical abuse, led Sapeda to leave him four or five times during the marriage. Sapeda left Garcia for the final time on August 22, 1982, and took Crystal with her. Shortly thereafter, Garcia appeared at the home where Sapeda was staying, seized Crystal, and left. Thereafter, Sapeda had difficulty seeing Crystal and never was able to see her alone.

In October of 1982, Garcia hired an attorney to file a dissolution of marriage action. The summons and petition were served on Sapeda, and she brought them with her when she met with respondent on December 9 (the first time she had ever dealt with a lawyer). At that time she knew Garcia wanted a divorce and custody of Crystal, but knew little else.

Respondent requested a $350 retainer to begin work. On December 13, Sapeda paid respondent $300. That day, they went to a scheduled temporary orders hearing, but the hearing was vacated because Garcia's attorney could not be present. Also on that day, respondent filed a response and cross-petition for dissolution of the marriage and requested that custody of Crystal be awarded to Sapeda.

On December 20, Sapeda called respondent and requested extra visitation during the Christmas holidays. Respondent made a phone call, learned that Garcia had traveled to Denver for the holidays, and did nothing more.

A permanent orders hearing was scheduled for the morning of January 17, 1983. On January 14, respondent contacted Garcia's attorney and requested a continuance because he had a conflicting court commitment. The request was refused because witnesses on Garcia's behalf were being brought in from Utah. Garcia's attorney also told respondent that, based upon the expected testimony of Garcia and the other witnesses concerning Sapeda's life-style, he did not think she had any chance of obtaining custody. After determining a continuance was not possible, respondent attempted to find another attorney to "cover" for him at the permanent orders hearing.

Respondent did not tell Sapeda about the scheduled hearing on January 17, and did not appear himself. The court awarded Garcia custody of Crystal. That afternoon, respondent called the court to explain his absence. The trial court's order of January 24, 1983, noted that neither respondent nor Sapeda was present and that "approximately 15 minutes after the hearing termi-

nated, respondent's counsel called the Court and advised that he had overlooked the fact that a hearing was scheduled in this matter."

Sapeda learned of the hearing through another source on the afternoon of January 17. She met with respondent on January 18, and again on March 10 and April 4. Respondent's secretary's notes reveal that detailed information was taken from Sapeda regarding her living situation and income, as well as more information about Garcia. At one point, Sapeda wrote respondent a letter which included the statements that she "want[ed her] baby" and thought Crystal "[would] be better off with [her]."

Although respondent testified it was relatively simple to reopen a permanent order, he did not do so for Sapeda. He stated he never understood that she wanted custody, but only more favorable visitation rights. Respondent did nothing else for Sapeda, and formally withdrew as counsel in January of 1985.

Sapeda finally consulted another attorney, and found out for the first time about the attorney grievance procedures. She filed a complaint fourteen months after the last meeting with respondent, which led to this proceeding. Prior to the hearing, the disciplinary prosecutor's motion to allow admission of respondent's prior disciplinary record was granted. Respondent testified on direct examination that he knew he had not been asked to obtain custody because it was a simple matter to reopen a permanent order and he would have done so had he been asked. He was then cross-examined with reference to his prior disciplinary record, which included failing to appear at court hearings, neglect and delay in client matters, and receiving fees from clients but not performing services.

Respondent testified that he had a busy practice and did much *pro bono* work for poor people. It was his usual practice to have his secretary sit in on client meetings and take notes, but he did not have notes from the December 9 or January 18 meetings and could not explain why.

He testified that he always understood that Sapeda only wanted visitation rights, even though he requested custody for her in the cross-petition for dissolution that he filed after his first meeting with her and despite having received a letter from her saying she "want[ed her] baby." He said he had been told by Garcia's attorney that, because of her life-style, Sapeda had little chance of obtaining custody. He testified that he did not appear at the January 17 hearing because he thought it was in the afternoon.

Sapeda also testified at the hearing. She stated that she always intended to seek custody of Crystal, and that respondent had assured her at their first meeting that it was likely she would prevail because, although it was common practice for fathers to request custody, mothers generally received the award.

Respondent's secretary testified that she never understood that Sapeda wanted custody of Crystal, but admitted she never questioned Sapeda about her wishes directly. The secretary could not explain why the notes from the December 9 and January 18 meetings could not be found. She estimated that respondent averaged three to five client meetings and a couple of court appearances a day and that between the time he last saw Sapeda and the grievance hearing he had had over 2,000 client meetings and 300 new clients.

The attorney for Garcia also testified. He stated that he had told respondent that Sapeda had little chance to obtain custody, but that opinion was based entirely on statements from Garcia and Garcia's aunt. He also stated he did not think Sapeda was serious about obtaining custody because respondent did so little in that direction.

At the conclusion of the hearing, the hearing board apparently chose to believe Sapeda. Although admitting the different versions of the testimony were not "easily resolved," the hearing board observed that this was Sapeda's first contact with an attorney, she was only eighteen at the time, and the subject was of vital importance to her.

The hearing board concluded that Sapeda had requested custody and that respondent had not given her legal problems the time and attention they required. It also concluded that respondent had failed to: adequately determine Sapeda's legal needs; contact her regarding the permanent orders hearing; obtain (or even negotiate for) any type of visitation rights; dicuss the expected adverse testimony of Garcia and his witnesses with Sapeda; appear at the permanent orders hearing; and even attempt to reopen the permanent order which was entered *ex parte* because of his absence. As a result, the hearing board concluded, "Sapeda forfeited her right to participate meaningfully in the legal process pursuant to which custody and visitation decisions concerning her infant daughter were made."

The hearing board concluded that the testimony established by clear and convincing evidence that the respondent had violated DR 1–102(A)(1) (violation of a disciplinary rule), DR 1–102(A)(6) (conduct that adversely reflects on fitness to practice law), DR 6–101(A)(2) (handling a legal matter without adequate preparation), DR 6–101(A)(3) (neglect of a legal matter), DR 7–101(A)(1) (intentionally failing to seek lawful objectives of the client), and DR 7–101(A)(2) (failing to carry out a contract of employment with a client). The board held that respondent had not violated DR 9–102(B) (measures for safekeeping of client's funds or property), or C.R.C.P. 241.-6(1) and (2), with which he also had been charged.

In recommending discipline, the hearing board referred for the first time to respondent's prior disciplinary record. He had received a six-month suspension in 1982 for, among other things, "a pattern of setting several matters in different courts at the same time [and] a failure to appear at scheduled times before the courts...." *People v. Yaklich,* 646 P.2d 938, 939 (Colo. 1982). The opinion in *Yaklich* referred to three prior letters of admonition for negligence and delay, failing to perform services as agreed, and negligently allowing a default decree to be entered against a client in a marriage dissolution action.

In view of the prior discipline for conduct substantially similar to the kind established here, and because of the violations of the Code of Professional Responsibility, the hearing board recommended that respondent be required to pay restitution to Sapeda in the amount of $300, that he be assessed the costs of the proceedings, and that he be suspended from the practice of law for two years. A hearing panel of the Grievance Committee concurred in the recommendation.

## II.

Respondent filed exceptions to the hearing board's findings of fact and conclusions. He also contends that it was prejudicial error to allow the disciplinary prosecutor to impeach his testimony by reference to his disciplinary record. Finally, he argues that even assuming misconduct, the recommended discipline was excessive.

## A.

In his exceptions to the factual findings, respondent contends that the "inherent credibility issues present in this matter place in serious doubt whether the Hearing Board's findings" can meet the clear and convincing standard demanded by C.R.C.P. 241.14(d). In support of this contention, he argues that since almost all of the hearing board's significant findings rely on the testimony of Sapeda and her testimony was "internally inconsistent" and "in direct conflict" with his own, and the hearing board conceded that the conflict was not easily resolved, the findings are not supported by clear and convincing evidence.

We have held that "the factual findings of the Grievance Committee are binding upon this court unless, after considering the record as a whole, we conclude that they are clearly erroneous and unsupported by substantial evidence." *People v. Gibbons,* 685 P.2d 168, 173 (Colo.1984). While it is true that there was some conflict in the testimony, Sapeda's testimony was by no means incredible and, when combined with respondent's admissions, constitutes

substantial evidence sufficient to support the hearing board's factual findings.

### B.

Respondent next argues that it was prejudicial error to allow his testimony to be impeached by reference to his prior disciplinary record.

■ During the course of cross-examination, the prosecutor was permitted to question respondent regarding his prior disciplinary record. Respondent contends that the rules of procedure regarding lawyer discipline forbid the introduction of evidence of an attorney's prior misconduct before the hearing board prepares its recommendation for the hearing panel. In the alternative, he argues, the prejudicial impact of his disciplinary record outweighed its probative value.

C.R.C.P. 241.15(a) provides that:

At the conclusion of the hearing, the hearing board shall prepare a report setting forth its findings of fact and recommendation and submit it to the hearing panel for its consideration. In preparing its report, the hearing board shall take into consideration the respondent's prior disciplinary record, if any....

Respondent asks us to construe that rule as prohibiting introduction of evidence of an attorney's prior misconduct except for purposes of allowing the hearing board to prepare its report.

The plain language of the rule compels no such reading. The rule merely requires that the board consider prior misconduct in making its recommendation, and is silent with respect to the other uses to which evidence of prior misconduct might permissibly be put. In addition, the blanket prohibition urged by respondent would frustrate necessary and legitimate uses of an attorney's prior disciplinary record.

We recognize, however, that evidence of an attorney's disciplinary record may be prejudicial given its limited relevance, and it should be admitted only in narrowly circumscribed cases. The Colorado Rules of Evidence reflect an appropriate balance between the potential prejudice of such evidence and the necessity of using the evidence in certain cases:

Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

CRE 404(b). *See* C.R.C.P. 241.14(d) (disciplinary proceedings shall be conducted in conformity with the Colorado Rules of Evidence).

■ In this case, respondent testified that reopening Sapeda's case for the purpose of modifying the custody order would have been a simple matter, and that if she had requested him to do so, he would have done so. He intended the board to infer from his not having reopened the case that Sapeda had not asked him to do so. In order to rebut that inference, the prosecutor questioned respondent about his failure in the past to attend to simple matters, and in the course of the questioning referred specifically to his disciplinary record. Because respondent chose to support his testimony by claiming, in essence, that he regularly attended to his clients' needs, the prosecutor was properly permitted to refer to his prior misconduct to refute that claim. *Croce v. Bromley Corp.*, 623 F.2d 1084, 1091–92 (5th Cir.1980), *cert. denied,* 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981) (evidence of pilot's prior negligent acts admissible to refute testimony that he had reputation of being careful pilot); *Atkinson v. Atchison, Topeka & Santa Fe Railway Co.*, 197 F.2d 244, 246 (10th Cir. 1952) (evidence of driver's subsequent negligence admissible to impeach her testimony that she was cautious driver); *see generally* 1 D. Louisell & C. Mueller, *Federal Evidence* § 142, at 54–58 (1977 & 1987 Supp.). We thus find that evidence of an attorney's disciplinary record may be, and here properly was, admitted to the extent allowed under the Colorado Rules of Evidence.

Respondent further argues that the probative value of his prior misconduct was "substantially outweighed by the danger of unfair prejudice." CRE 403. Although a lay jury may be unfairly prejudiced by evidence of prior misconduct, respondent's case was heard by a panel of lawyers experienced in the areas of professional responsibility and attorney discipline. We believe they were able to consider respondent's prior discipline solely for the limited purposes for which it was offered, and whatever danger there may have been of prejudice was minimal.

### C.

Finally, respondent argues that the two-year suspension recommended by the Grievance Committee is too harsh. We disagree.

Here, the respondent has violated several disciplinary rules. He neglected an important matter and failed to carry out his client's objective of obtaining custody of her child. His misconduct prevented his client from presenting her side of the case to the trial court in a matter of utmost importance. This is particularly egregious because his client was young, unsophisticated, had never used an attorney before, and relied entirely upon respondent's control over her case. *See American Bar Association Standards for Imposing Lawyer Discipline* § 9.22(h) (1986) (vulnerability of victim may be considered as an aggravating factor in fixing punishment). In addition, in 1978, the respondent received a letter of admonition resulting from his failure to appear on behalf of his client on a date set for permanent orders in a dissolution of marriage proceeding, and thereby allowed a default decree to be entered. *People v. Yaklich,* 646 P.2d 938 (Colo. 1982). That conduct parallels his failure in this case and convinces us that the respondent's previous discipline and suspension of three months in 1982 did little to rectify his unprofessional habits.

Accordingly, Respondent is suspended from the practice of law for two years from the date of this opinion, directed to pay restitution of $300 to Sapeda, and directed to pay the costs of these proceedings in the amount of $1,453.54 to the Supreme Court Grievance Committee, 600 17th St., Suite 500 S, Denver, Colorado, 80202–5435, within thirty days of the announcement of this opinion.